1

2

3

4

5

6

7

8

9
UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11

12
CARLOS M. GOMEZ, SR.,

13
Plaintiff,

14
v.

15
CITY OF VACAVILLE, et al.,

16
Defendants.

No. 2:18-cv-2698-KJM-KJN

ORDER

17

18    In this civil rights case arising out of an altercation between City of Vacaville

19  police officer William Boehm ("Boehm") and plaintiff Carlos M. Gomez ("Gomez"), defendants

20  move for summary judgment, or, in the alternative, for partial summary judgment on all claims.

21  For the reasons stated below, defendants' motion for summary judgment is DENIED.

22  I.    BACKGROUND

23        A.    Undisputed Facts

24              The court has compared the parties' statements of fact and reviewed the available

25  dashboard camera footage, Ex. 1 ("Dash. Cam."), body camera footage, Ex. 3 ("Moore's Body

26  Cam."); Ex. 7 ("Bellamy Body Cam."), and dispatch recordings, Ex. 2 ("Dispatch Recordings"),

27  provided by plaintiff and lodged with the court in DVD format, ECF No. 29 (Notice of Lodging).

28  Based on this review of the record, the court finds the following facts are undisputed, except

1

1    where noted.[1]  On August 28, 2017, Dolores Gomez ("Dolores"), plaintiff Carlos Gomez

2    ("Gomez") and their son Carlos Gomez, Jr. ("Junior") ate dinner at Gomez's family home.  Mot.

3    for Summ. J. ("MSJ"), ECF No. 25, at 7–8; Opp'n at 5 (citing, *inter alia*, Dolores Dep., ECF No.

4    28-4, at 13–15[2]).  Gomez and Junior each had a shot of vodka after dinner.  MSJ at 8; Opp'n at 5

5    (citing Gomez Dep., ECF No. 28-5, at 43).  By about 10 p.m., Junior had left dinner and was

6    sitting in his car in front of the house.  Opp'n at 5 (citing Delores Dep. at 14).

7            At about 11:00 p.m., Officer Steven Moore, who is not a party in this case, pulled

8    over near Junior's vehicle, after having seen a male standing next to the vehicle waving his hands

9    earlier in the night.  MSJ at 8 (citing Moore Decl. ¶¶ 2–4, ECF No. 25-3).  When Officer Moore

10   approached, he saw the driver's side rear window was shattered and Junior was sitting in the

11   driver's seat.  *Id.* (citing Moore Decl. ¶ 4).  Officer Moore told Junior to show his hands; Junior

12   did not immediately comply.  *Id.*; Moore Decl. ¶ 6.  An altercation followed between Moore and

13   Junior during which Junior advanced on Officer Moore, who used his radio to call for "Code 11,"

14   a covert request for backup.  MSJ at 8–9 (citing Moore Decl. ¶ 7; Moore Dep., ECF No. 25-1, at

15   14:11–20, 15:13–16:1, 19:14–22).  Officer Moore eventually deployed his taser against Junior, in

16   an effort to subdue him, and reported his use of the taser over the radio.  MSJ at 9–10 (citing

17   Moore Decl. ¶ 9; Moore Dep. 20:16–18; Boehm Decl. ¶ 5, ECF No. 25-2; Boehm Dep., ECF No.

18   25-1, at 19:16–18).  Officer Moore's use of force is not at issue in this case.

19           Before Boehm arrived, Gomez, with Dolores in tow, approached the scene and

20   yelled at Officer Moore, asking why he had tased Junior and what was going on, to which Officer

21   Moore responded by telling Gomez to stand back.  Opp'n at 6 (citing Gomez Dep. at 47).

22

23           [1] Defendants did not submit a statement of undisputed facts in the format required by
24   Eastern District Local Rule 260(a), but rather summarized the facts in narrative form in their
     briefing.  Plaintiff also submitted a summary of facts, in violation of Local Rule 260(b).  Plaintiff,
25   in turn, did not respond to defendants' facts in the manner proscribed by Local Rule 260.  *See*
     Opp'n, ECF No. 28, at 5.  Though the parties' mode of presentation of facts has delayed the
26   court's resolution of the motion, for the sake of efficiency, the court has not penalized the parties
     or directed the filing of supplemental clarifications.
27           [2] The court refers to the internal pagination when citing to deposition transcripts, not the
28   ECF pagination.

2

According to plaintiff, Dolores told Officer Moore that Gomez could not hear him, but defendants dispute that Officer Moore heard her say this.  *Id.* (citing Dolores Dep. at 19).  Then, Junior stood up, pulled the taser darts off his body, and started to challenge Officer Moore to a fight.  *Id.* (citing Dash. Cam. at 22:56:47–22:56:50).  The two engaged in a scuffle before Officer Moore again deployed his taser and Junior fell or lay down on the ground.  Dash. Cam. at 22:56:50–22:57:09.  Gomez, standing roughly 6 to 10 feet away with no indication he was armed, continued yelling at Officer Moore.  *See* MSJ at 10 (citing, *inter alia*, Moore Decl. ¶ 11; Moore Dep. 20:24–21:23, 21:25–22:4); Opp'n at 6 (citing Dash. Cam. at 22:57:14– 22:57:30).

Over the radio, defendant Boehm heard Officer Moore advise that he was investigating a situation involving a subject and a vehicle with a shattered window and heard Moore's request for Code 11 cover.  MSJ at 9 (citing Boehm Decl. ¶¶ 2–4; Boehm Dep. at 18:10–17).  He also heard Officer Moore say he had deployed his taser and that a second subject, now identified as Gomez, was approaching him.  *Id.* at 9–10 (citing Moore Decl. ¶ 9; Moore Dep. 20:16–18; Boehm Decl. ¶ 5; Boehm Dep. 19:16–18); *see also* Boehm Decl. ¶ 6.

When Officer Boehm arrived on the scene with Sgt. Larsen, Gomez and Officer Moore were still shouting at each other.  Opp'n at 6; Dash. Cam. at 22:57:14– 22:57:30.  It is disputed whether Junior was under the officer's control at this point, though the dashboard camera footage suggests Junior was lying on the ground motionless and Moore was kneeling beside him, pointing his taser at Gomez, who was approximately 8 feet away.  *Id.* (citing Dash. Cam. at 22:57:30–34).  As Officer Boehm and Sgt. Larson exited their vehicle, Gomez turned away from the officers, threw his hands up, and began walking away from them.  Dash. Cam. at 22:57:38–22:57:40.  Officer Moore asked Officer Boehm and Sgt. Larson to detain Gomez for "148," which is the code section for misdemeanor offense of resisting or disrupting a police officer.  Opp'n at 6 (citing Moore Body Cam. at 22:57:36–37).  Within seconds of arriving on the scene, either Boehm or Larson yelled "on the ground, on the ground now!" three times and ran towards Gomez, who continued walking away, towards his house and vehicle, at a normal walking pace.  *Id.* at 7 (citing Moore Body Cam. at 22:57:38–39; Dash. Cam. at 22:57:38–39).

/////

3

1    As shown on the dashboard camera footage, Boehm rammed the right side of

2    Gomez's upper-body hard enough to cause Gomez to fall some distance from where he had been

3    walking.  Dash. Cam. at 22:57:39–43.  Gomez landed on the pavement, cracking his head, and

4    Boehm fell on top of him.  Opp'n at 7 (citing Dash. Cam. at 22:57:40-41; Dolores Dep. at 20).

5    According to plaintiff, Gomez was immediately knocked unconscious.  *Id.* (citing Gomez Dep. at

6    49, 53).  Boehm and Larsen then attempted to roll Gomez over by yanking on his arms and, in the

7    process, dragged Gomez's face on the asphalt.  *Id.* (citing Dash. Cam. at 22:57:42–48).  Boehm

8    placed his knees on Gomez's back and handcuffed him, then rolled him into a seated position and

9    radioed for medical aid.  *Id.* (citing Dash. Cam. at 22:57:48–22:58:25).

10   Gomez is hard of hearing, such that he is not always able to hear even when yelled

11   at.  MSJ at 13 (citing Gomez Dep. 23:5–19, 24:1–10, 24:19–22, 25:1–9).  At the time of the

12   incident, Gomez was not wearing hearing aids.  *Id.*; Gomez Dep. 23:15–21.

13   Defendants describe Gomez as "an adult male of average build, who appeared to

14   be 5'10, 180 pounds," but allege Boehm "was unable to determine his approximate age."  MSJ at

15   12 (citing Boehm Dep. 22:12–23:7).  However, the recording of Officer Boehm's radio

16   communications to dispatch captured Boehm describing Gomez as "an elderly male," when he

17   radioed for medical assistance, suggesting his older age was apparent to Officer Boehm at that

18   time.  Opp'n at 7 (citing Dash. Cam. at 22:58:12–25; Dispatch Recording at 22:58:25).  The

19   dashboard camera footage also shows Gomez has white hair, further suggesting his status as an

20   elderly individual was readily apparent.  *See generally* Dash. Cam.

21   Gomez went in and out of consciousness immediately after the incident and, the

22   day after the assault, he remembers doctors telling him he had suffered a brain hemorrhage.

23   Opp'n at 8 (citing Gomez Dep. at 70).  He stayed in the hospital for three days, with the following

24   injuries: left epidural/subdural hematoma, parenchymal hemorrhage in the inferior right frontal

25   lobe, trace subdural hematoma along the anterior falx, and left temporal bone and left occipital

26   fracture.  Opp'n at 8 (citing Ex. 4 ("Medical Records"), ECF No. 28-3, at 1).  The bones in his

27   left ear were shattered and he was told he would have permanent hearing loss; his balance has

28   since worsened.  *Id.* (citing, *inter alia*, Gomez Dep. at 74–76).  Plaintiff reports experiencing

4

1   dizzy spells, headaches, and nightmares as a result of the incident.  *Id.* at 8–9 (Gomez Dep. at 75–

2   82, 84–85).  Plaintiff testified at deposition that he also experienced a diabetes complication due

3   to stress from the incident.  *Id.* at 9 (citing, *inter alia*, Gomez Dep. at 82).

4           B.    <u>Procedural Background</u>

5           On October 4, 2018, plaintiff filed a complaint against the City of Vacaville and

6   Officer Boehm, which included four claims: (1) excessive force in violation of the Fourth

7   Amendment, brought under 42 U.S.C. § 1983, (2) battery, (3) violation of the Bane Act,

8   California Civil Code § 52.1, and (4) negligence.  Compl., ECF No. 1.  As noted, defendants

9   move for summary judgment or, alternatively, partial summary judgment, on all of plaintiff's

10  claims.  They argue summary judgment is proper because: "(1) Gomez's §1983 claim for

11  violation of the Fourth Amendment is unsupportable; (2) Officer Boehm is entitled to qualified

12  immunity from Gomez's §1983 claim; (3) the state law battery claim is unsupportable; (4) the

13  Bane Act claim is meritless; (5) the negligence claim is unsupported by evidence; and

14  (6) defendants are immune from liability under Gov't Code §§ 815.2 and 820.2."  MSJ at 7.

15  Plaintiff opposes, Opp'n, and defendants have replied, Reply, ECF No. 33.  The court heard oral

16  argument on the motion on March 12, 2020, and requested supplemental briefing on the case of

17  *Santos v. Gates,* 287 F.3d 846 (2002).  *See* Pl.'s Suppl. Br., ECF No. 36; Defs.' Suppl. Br., ECF

18  No. 37.  After receiving the supplemental briefing, the court submitted the matter.

19          For the reasons below, summary judgment is DENIED.

20  II.    <u>DEFENDANTS' EVIDENTIARY OBJECTIONS</u>

21          On reply, defendants object to plaintiff's Exhibit 4, ECF No. 28-3, and Exhibit 7,

22  lodged with the court, arguing they are both irrelevant and Exhibit 4 is not authenticated.  Reply

23  at 15 (citing *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002); Fed. R. Evid. 901(a), 402,

24  403).  Defendants also argue the declaration of Theodore Colias, ECF No. 28-1, lacks foundation

25  and fails to show personal knowledge.  Reply at 15 (citing Fed. R. Evid. 602).

26          Parties may object to evidence cited to establish undisputed facts.  *In re Oracle*

27  *Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010).  A court may consider evidence that

28  would be "admissible at trial."  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  But the

1    evidentiary standard for admission at the summary judgment stage is lenient: A court may

2    evaluate evidence in an inadmissible form if the evidentiary objections could be cured at trial.

3    *See Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119–20 (E.D. Cal. 2006).  In

4    other words, admissibility at trial depends not on the evidence's form, but on its content.  *Block v.*

5    *City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*,

6    477 U.S. 317, 324 (1986)).  The party seeking admission of evidence "bears the burden of proof

7    of admissibility."  *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  If the

8    opposing party objects to the proposed evidence, the party seeking admission must direct the

9    district court to "authenticating documents, deposition testimony bearing on attribution, hearsay

10   exceptions and exemptions, or other evidentiary principles under which the evidence in question

11   could be deemed admissible . . . ."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 385–86.  However,

12   courts are sometimes "much more lenient" with the affidavits and documents of the party

13   opposing summary judgment.  *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

14          Exhibit 4 appears to be a page from plaintiff's medical records from Kaiser.

15   Though it may not be properly authenticated, the court may consider it at this stage because the

16   authentication issue may be cured at trial; nothing about the document's contents suggests it

17   would be inadmissible at trial if properly authenticated.  *See Burch*, 433 F. Supp. 2d at 1119–20.

18   Furthermore, plaintiff's medical records are relevant here, because the injuries plaintiff suffered

19   provide insight into the quantum of force used by Boehm.  *See Santos v. Gates*, 287 F.3d 846,

20   854–54 (9th Cir. 2002) (finding "takedown" by officers was "quite severe" use of force, because

21   consequences of resulting injuries "endured for a significant period of time").  Defendants'

22   objection to Exhibit 4 is OVERRULED.

23          Exhibit 7 is body camera footage from Officer Bellamy, who apparently

24   interviewed plaintiff while he was in the hospital.  The footage is relevant, because it purports to

25   show plaintiff's physical state relatively soon after the incident, in particular, plaintiff's bloodied

26   face, which, like the medical records, shows the effect of the force on plaintiff, further supporting

27   a factfinder's evaluation of the quantum of force used.  Defendants' objection to Exhibit 7 is

28   OVERRULED.

1    Finally, Theodore Colias states in his declaration that he is Gomez's neighbor and

2    that he witnessed the incident on August 28, 2017.  Colias Decl. ¶ 1.  This is sufficient to

3    establish Mr. Colias's personal knowledge of the incident, because it would make him an

4    eyewitness.  Defendants' further objections, that Colias "improperly offers expert testimony that

5    Gomez was 'knocked out'" and his statement that Dolores told officers Gomez "can't hear" is

6    improper hearsay, are both OVERRULED for the purposes of this motion only.  The first

7    statement is considered as a lay opinion and the second is considered for non-hearsay purposes

8    only.

9    III.    LEGAL STANDARD

10    A court will grant summary judgment "if . . . there is no genuine dispute as to any

11    material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

12    The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

13    resolved only by a finder of fact because they may reasonably be resolved in favor of either

14    party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

15    As a general matter, the moving party bears the initial burden of showing the

16    district court "that there is an absence of evidence to support the nonmoving party's case."

17    *Celotex Corp.*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, which "must

18    establish that there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith*

19    *Radio Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to

20    particular parts of materials in the record . . . ; or show [] that the materials cited do not establish

21    the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

22    evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586

23    ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt

24    as to the material facts").  Moreover, "the requirement is that there be no genuine issue of

25    material fact . . . . Only disputes over facts that might affect the outcome of the suit under the

26    governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at

27    247–48 (emphasis in original).

28    /////

7

1    In deciding a motion for summary judgment, the court draws all inferences and

2   views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at

3   587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a

4   whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

5   issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.*

6   *Co.*, 391 U.S. 253, 289 (1968)).  Where a genuine dispute exists, the court draws inferences in

7   plaintiffs' favor.  *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

8    The Supreme Court has taken care to note that district courts should act "with

9   caution in granting summary judgment," and have authority to "deny summary judgment in a case

10   where there is reason to believe that the better course would be to proceed to a full trial."

11   *Anderson*, 477 U.S. at 255.  A trial may be necessary "if the judge has doubt as to the wisdom of

12   terminating the case before trial."  *Gen. Signal Corp. v. MCI Telecomm. Corp.*, 66 F.3d 1500,

13   1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)).  This may

14   be the case "even in the absence of a factual dispute."  *Rheumatology Diagnostics Lab., Inc v.*

15   *Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22

16   F.3d at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

17   IV.    DISCUSSION

18    A.    Fourth Amendment Claim for Excessive Force

19    "'Reasonableness is always the touchstone of Fourth Amendment analysis,' and

20   reasonableness is generally assessed by carefully weighing 'the nature and quality of the intrusion

21   on the individual's Fourth Amendment interests against the importance of the governmental

22   interests alleged to justify the intrusion.'"  *County of Los Angeles v. Mendez*, 137 S. Ct. 1539,

23   1546 (2017) (internal citations omitted).

24    The guarantees of the Fourth Amendment include protection from the use of

25   excessive force by "law enforcement officers . . . in the course of an arrest, investigatory stop, or

26   other 'seizure' of a free citizen . . . ."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "All claims

27   of excessive force, whether deadly or not, are analyzed under the objective reasonableness

28   standard of the Fourth Amendment as enunciated in *Graham* and *Garner*."  *Blanford v.*

8

1    *Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005).  This standard requires the court to

2    "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests

3    against the importance of the governmental interests alleged to justify the intrusion." *Tennessee*

4    *v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).  In

5    striking this balance, the court "must consider the risk of bodily harm that [Boehm's] actions

6    posed to [Gomez] in light of the threat to the public that [Boehm] was trying to eliminate." *Scott*

7    *v. Harris*, 550 U.S. 372, 383 (2007).  The court pays "careful attention to the facts and

8    circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether

9    the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the

10   suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at

11   396.  "Because this inquiry is inherently fact specific, the 'determination whether the force used

12   to effect an arrest was reasonable under the Fourth Amendment should only be taken from the

13   jury in rare cases.'" *Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir.

14   2014) (quoting *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1205–06 (9th Cir.

15   2000)) (reviewing case based on investigatory stop).

16          "The 'reasonableness' of a particular use of force must be judged from the

17   perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

18   *Graham*, 490 U.S. at 396 (citation omitted).  Further, "[t]he calculus of reasonableness must

19   embody allowance for the fact that police officers are often forced to make split-second

20   judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount

21   of force that is necessary in a particular situation." *Id.* at 396–97.  "Therefore, courts 'are free to

22   consider issues outside the three enumerated [in *Graham*] when additional facts are necessary to

23   account for the totality of circumstances in a given case.'" *Velazquez v. City of Long Beach*,

24   793 F.3d 1010, 1024 (9th Cir. 2015) (alteration in original) (quoting *Mattos v. Agarano*, 661 F.3d

25   433, 441 (9th Cir. 2011) (en banc)).

26          B.      Existence of a Constitutional Violation

27          "Although not limited to these factors, we assess the reasonableness of force by

28   analyzing: '(1) the severity of the intrusion on the individual's Fourth Amendment rights by

9

1    evaluating the type and amount of force inflicted, (2) the government's interest in the use of

2    force, and (3) the balance between the gravity of the intrusion on the individual and the

3    government's need for that intrusion.'" *Kuhlken v. Cty. of San Diego*, 764 F. App'x 612, 613–14

4    (9th Cir. 2019) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017)).

5                        1.      Nature and Quality of Intrusion

6                Boehm's use of force against Gomez consisted of a very hard push, from a running

7    start, that knocked Gomez off his feet and caused Gomez to land on the asphalt some distance

8    away.  Dash. Cam. at 22:57:39–43.  As described above in more detail, plaintiff offers evidence

9    to show this caused Gomez to lose consciousness, and he suffered brain injuries requiring a three-

10   day hospital stay and leading to persistent dizziness spells and headaches.  Opp'n at 8 (citing,

11   *inter alia*, Gomez Dep. at 70, 74–77; Medical Records at 1).  Gomez's face was bloodied, and his

12   inner ear was damaged such that he has experienced permanent hearing loss, affecting his already

13   limited hearing.  *Id.* at 8 (citing, *inter alia*, Gomez Dep. at 74–76); *id.* at 12 (citing Bellamy Body

14   Cam.).  Plaintiff also offers his own testimony that he experienced a diabetes complication due to

15   stress from the incident.  *Id.* at 9 (citing Gomez Dep. at 82).  Defendants do not directly dispute

16   any of this evidence, except to argue the medical records and body camera footage showing

17   Gomez's bloodied face are irrelevant.  Reply at 15.  The court has overruled these objections.

18               Though a very strong push or shove is not necessarily a significant intrusion in

19   every situation, here Gomez hit the asphalt, and the effect the push had on his body in the

20   moment and the resulting injuries suggest the quantum of force used by Boehm was significant.

21   *Compare Santos*, 287 F.3d at 853–54 (finding "takedown" by officers was "quite severe" use of

22   force, because consequences of resulting injuries "endured for a significant period of time"), *with*

23   *Trevino v. City of Bakersfield*, No. 1:14-CV-001873-JLT, 2016 WL 1090307, at *3, 5 (E.D. Cal.

24   Mar. 21, 2016) ("relatively minor" force used where officer sprinted towards plaintiff and

25   knocked him into grass, because plaintiff did not claim he was injured in the area where officer

26   pushed him).

27   /////

28   /////

                                                    10

1

2.      <u>Government Interests</u>

2

"Under *Graham v. Connor*, we evaluate the government's interest in the use of

3

force by examining three core factors, 'the severity of the crime at issue, whether the suspect

4

poses an immediate threat to the safety of the officers or others, and whether he is actively

5

resisting arrest or attempting to evade arrest by flight.'" *Bryan v. MacPherson*, 630 F.3d 805, 826

6

(9th Cir. 2010) (quoting *Graham,* 490 U.S. at 396).

7

a.      <u>Severity of the Crime</u>

8

The severity of the crime Boehm suspected Gomez of weighs against the use of

9

force.  At the time Boehm used force on Gomez, Boehm was attempting to apprehend him, at

10

Officer Moore's coded request, for a violation of California Penal Code section 148(a), which is

11

the misdemeanor offense of resisting, delaying or obstructing a police officer.  Cal. Penal Code

12

§ 148(a)(1).  The circumstances suggest Officer Boehm would have understood Officer Moore's

13

request to be based on Gomez's having walked towards Moore at some point while he was trying

14

to arrest Junior and failing to respond to whatever orders Moore was yelling at him when Boehm

15

arrived.  Under Ninth Circuit precedent, this offense is not severe for the purposes of this

16

analysis. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) (finding "failing to

17

immediately comply with an officer order to get back from the scene of an arrest, when he was

18

already standing thirty-seven feet away" was "far from severe") (citing *Davis v. City of Las*

19

*Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (trespassing and obstructing a police officer were not

20

"serious offenses")); *see also Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)

21

(domestic violence suspect was not "particularly dangerous," and his offense was not "especially

22

egregious").  Accordingly, the severity of the suspected crime weighs against the use of force

23

here. *See Bryan*, 630 F.3d at 828–29 (9th Cir. 2010)  ("While the commission of a misdemeanor

24

offense is not to be taken lightly, it militates against finding the force used to effect an arrest

25

reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers

26

or others." (internal quotation marks and citation omitted)).

27

28

11

1          b.      Threat to Safety

2          "The most important *Graham* factor is whether the suspect posed an immediate

3    threat to anyone's safety." *Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) (citing

4    *Mattos*, 661 F.3d at 441).  It is undisputed Boehm was aware that, at one point, an individual

5    other than Junior had approached Officer Moore, because Officer Moore communicated it via

6    radio.  *See* MSJ at 10.  Officer Moore also told Boehm to arrest Gomez for "148," implying he

7    resisted a police officer.  *Id.* at 11–12.  Upon arriving at the scene, Boehm likely witnessed

8    Gomez yelling at Officer Moore.  Dash. Cam. at 22:57:30–35.  In light of these facts, a

9    reasonable officer may have been on heightened alert upon arriving at the scene.

10          However, according to the video footage, once Boehm exited his vehicle, Gomez

11   turned away from officers, threw his hands up, and started walking away at a normal pace.  Dash.

12   Cam. at 22:57:35–45.  At this point, there is very little to suggest Gomez was a threat to officer

13   safety, or anyone's safety.  Defendants argue he posed a threat because he may have been

14   returning to his home or a vehicle to retrieve a weapon.  Mot. at 12–13.  Whether a reasonable

15   officer would have perceived Gomez walking in the direction of his house as a potential threat,

16   however, is a question of fact reserved for the jury.  Furthermore, plaintiff offers evidence to

17   show it was obvious to Boehm that Gomez was an elderly man, further counseling against finding

18   Gomez, who was clearly unarmed at the time, was a threat to safety.  *See* Dispatch Recording at

19   22:58:25.

20          Drawing all reasonable inferences in plaintiff's favor, Gomez did not appear to

21   present a threat to anyone's safety at the time Boehm pushed him down.  *Trevino*, 2016 WL

22   1090307, at *6 (finding plaintiff posed no threat where he was "walking at a leisurely pace, with

23   no indication he was acting suspiciously or attempting to secrete himself in any manner").  At this

24   stage, factual disputes preclude finding as a matter of law that Gomez presented a safety threat at

25   the time Boehm used force.

26          c.      Actively Resisting or Evading Arrest

27          While Gomez appeared to be ignoring the officers' orders to "get down," a

28   reasonable jury could still find he was not actively resisting or evading arrest.  Walking away

1   from officers at a normal pace, without more, is generally not considered evading arrest, and is at

2   most "passive resistance."  *See Bryan*, 630 F.3d at 830 (drawing "distinction between passive and

3   active resistance"); *see also Silva v. Chung*, 740 F. App'x 883, 886 (9th Cir. 2018) (suspect who

4   walked away from officers after being instructed to do otherwise "never actively attempted to

5   evade arrest by flight"), *cert. denied,* 139 S. Ct. 1172 (2019); *Trevino*, 2016 WL 1090307, at *6

6   ("though the plaintiff was leaving the area, there is no evidence he reasonably appeared to be

7   doing so to evade arrest").  Notably, the sequence of events suggests Gomez may have been

8   complying with Officer Moore's previous orders to return to his property, *see generally* Moore

9   Body Cam., but it is unclear from the record whether Officer Boehm would have been aware of

10  Moore's prior commands when Boehm arrived on the scene.

11          Accordingly, this factor counsels against the use of force.

12          3.      Conclusion

13          In sum, factual questions remain regarding whether a reasonable officer would

14  have perceived Gomez as a safety threat.  It is the sole province of a jury to resolve these

15  questions, not that of the court.  The court cannot find that, as a matter of law, Boehm's

16  significant use of force was reasonable.  Summary judgment is not warranted.

17          C.      Qualified Immunity

18           "Qualified immunity is a judge-made doctrine designed to 'balance[ ] two

19  important interests—the need to hold public officials accountable when they exercise power

20  irresponsibly and the need to shield officials from harassment, distraction, and liability when they

21  perform their duties reasonably.'"  *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011)

22  (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The doctrine is intended to "give[]

23  government officials breathing room to make reasonable but mistaken judgments about open

24  legal questions."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

25          The two-pronged test currently used for assessing whether qualified immunity

26  applies was first articulated in *Saucier v. Katz*, 533 U.S. 194 (2001).  *Pearson*, 555 U.S. at 232

27  (citing *Saucier*, 533 U.S. at 201).  Under that test, the court first "decide[d] whether the facts that

28  a plaintiff has alleged or shown make out a violation of a constitutional right."  *Id.* (citing Fed. R.

Civ. P. 12, 50, 56; *Saucier*, 533 U.S. at 201).  Then, "if the plaintiff [] satisfied this first step, the court [] decide[d] whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citing *Saucier*, 533 U.S. at 201).

"[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656 (citations omitted) (per curiam). "[W]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." *Nehad*, 929 F.3d at 1140 (quoting *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)). "This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Baszler v. Cty. of Scotts Bluff*, No. 7:15CV5000, 2015 WL 4275963, at *3 (D. Neb. July 14, 2015) (quoting *Anderson*, 477 U.S. at 249); *see also Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("'[T]he ordinary framework for deciding motions for summary judgment' applies to motions for summary judgment based on official immunity." (citation omitted)).  In particular, in determining the established law, the court must take care not to define either the right at issue, or the defendant's conduct for that matter, in a manner that impermissibly resolves factual disputes. *Tolan*, 572 U.S. at 657 ("[C]ourts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.") (citing *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004)).

Since *Pearson*, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. at 236.  Here, the court has exercised its discretion and analyzed the first merits prong above as to the excessive force claim, finding plaintiffs have satisfied their burden on the first prong of the qualified immunity analysis.

Turning to the second prong, the court notes that clearly established law must be defined with a "high 'degree of specificity.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)); *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).  This standard is "demanding." *Wesby*, 138 S. Ct. at

14

1    589.  The "legal principle [at issue] must have a sufficiently clear foundation in then-existing

2    precedent." *Id.*  It "must be 'settled law,' which means it is dictated by 'controlling authority' or

3    'a robust consensus of cases of persuasive authority,'" rather than merely "suggested by then-

4    existing precedent." *Id.* at 589−90 (citations and some internal quotation marks omitted).

5              "[A] court must ask whether it would have been clear to a reasonable officer that

6    the alleged conduct 'was unlawful in the situation he confronted.'" *Ziglar*, 137 S. Ct. at 1867

7    (quoting *Saucier*, 533 U.S. at 202).  While "a case directly on point" is not required "for a right to

8    be clearly established, existing precedent must have placed the statutory or constitutional question

9    beyond debate," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v.

10   Pauly*, 137 S. Ct. 548, 551 (2017)), and must "'squarely govern[]' the specific facts at issue," *id.*

11   at 1153 (citing *Mullenix*, 136 S. Ct. at 309).  *See also Pike v. Hester*, 891 F.3d 1131, 1141 (9th

12   Cir. 2018) ("An exact factual match is not required . . . .").  "The rule's contours must be so well

13   defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he

14   confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202).  Thus, "[t]he

15   dispositive question is 'whether the violative nature of particular conduct is clearly established.'"

16   *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix*, 136 S. Ct. at 308) (emphasis,

17   alteration in original).

18             Where the existing cases are "too factually dissimilar to clearly establish a

19   constitutional violation" by an officer's actions, the officer is entitled to qualified immunity.

20   *Nicholson v. City of Los Angeles*, 935 F.3d 685, 695 (9th Cir. 2019).  However, "[p]recedent

21   involving similar facts can help move a case beyond the otherwise 'hazy border between

22   excessive and acceptable force' and thereby provide an officer notice that a specific use of force

23   is unlawful."  *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 136 S. Ct. at 312).  Although "general

24   statements of the law are not inherently incapable of giving fair and clear warning to officers,"

25   *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation omitted), in some circumstances "a general

26   constitutional rule already identified in the decisional law may apply with obvious clarity to the

27   specific conduct in question, even though 'the very action in question has [not] previously been

28   /////

1  held unlawful.'" *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018) (quoting *United*

2  *States v. Lanier*, 520 U.S. 259, 271 (1997)).

3         Because resolving whether the asserted federal right was clearly established

4  presents a pure question of law, the court draws on its "full knowledge" of relevant precedent

5  rather than restricting its review to cases identified by plaintiff.  *See Elder v. Holloway*, 510 U.S.

6  510, 514−16 (1994) (citing *Davis*, 468 U.S. at 192 n.9).  Ultimately, "the prior precedent must be

7  'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a

8  'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cty. Of Orange*, 871 F.3d 901,

9  911 (9th Cir. 2017) (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *see also Carroll v.*

10 *Carman*, 574 U.S. 13, 17 (2014) (assuming without deciding that controlling circuit precedent

11 could constitute clearly established federal law).

12             1.    Clearly Established Fourth Amendment Law Applicable to  Gomez's
                     Excessive Force Claim
13

14        In this case, the general Fourth Amendment standards discussed above provide a

15 "starting point," but "[t]he dispositive question is 'whether the violative nature of [Boehm's]

16 *particular* conduct [was] clearly established'" on August 16, 2016.  *Isayeva v. Sacramento*

17 *Sheriff's Department*, 872 F.3d 938, 947 (9th Cir. 2017) (emphasis in original) (quoting *Mullenix*,

18 136 S. Ct. at 308).

19        In 2017, it was clearly established that an officer was not justified in using more

20 than a minimal amount of force on a suspect who (1) was suspected of a minor misdemeanor,

21 (2) was not a threat to officers or bystanders, and (3) was not fleeing or actively evading arrest.

22 *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1168 (9th Cir. 2011) ("The principle that it is

23 unreasonable to use significant force against a suspect who was suspected of a minor crime,

24 posed no apparent threat to officer safety, and could be found not to have resisted arrest, was thus

25 well-established in 2001[.]").  "This clear principle would have put a prudent officer on notice"

26 that pushing a suspect at a running speed "without first attempting a less violent means of

27 /////

28

1   arresting a relatively calm [misdemeanor] suspect" was a violation of that person's Fourth

2   Amendment Rights.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007).

3   Two Ninth Circuit cases are instructive; both arose out of altercations involving a

4   similar kind of force, a similar threat level posed by the suspect, and a suspect who was not

5   fleeing or evading arrest, as here.  First, in *Blankenhorn*, three officers used a "gang tackle" to

6   take down a known gang member suspected of misdemeanor trespass, who pulled his arm away

7   when an officer grabbed it and verbally refused to comply with an officer's order for him to kneel

8   down, but did not "actively resist" arrest before being gang-tackled.  485 F.3d at 478–79.  The

9   Ninth Circuit conducted the *Graham* balancing test and found a rational jury could find the gang

10  tackle was unreasonable under the circumstances and violated plaintiff's Fourth Amendment

11  rights.  In particular, the Circuit reached its conclusion because (1) plaintiff did not pose a serious

12  threat to anyone's safety, (2) he was not actively resisting arrest, and (3) the severity of the

13  alleged crime was minimal.  *Id.* at 478–79; *see also Trevino*, 2016 WL 1090307, at *6 (finding

14  officer's sprinting over and pushing plaintiff onto ground unreasonable where same factors

15  existed, suspect ignored officer's commands, and suspect was walking away at normal pace).

16  The court also added the pace of events was not "tense, uncertain, or rapidly evolving," and

17  therefore the latitude *Graham* affords for split-second police judgments" was likely not

18  warranted.  *Blankenhorn*, 485 F.3d at 478–79 (citing *Graham,* 490 U.S. at 397).

19  Similarly, in *Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002), plaintiff was suspected

20  of a minor misdemeanor and initially fled from officers, but stopped at a dead end.  *Id.* at 848.

21  According to plaintiff, he then got to his knees and put his hands on his head, and the two officers

22  initiated a "take-down" that fractured one of the plaintiff's vertebrae causing significant pain for

23  over a month and put plaintiff in a brace for roughly a year.  *Id.* at 848–50.  The Ninth Circuit

24  applied the framework in *Graham* and found that, viewing the evidence in plaintiff's favor, a

25  reasonable jury could find the officer used excessive force, primarily because (1) the crime at

26  issue was a minor offense, public intoxication, (2) plaintiff did not pose a threat, and (3) plaintiff

27  was not actively resisting arrest.  *Id.* at 854.  The Circuit also noted the force used was "quite

28  /////

17

1  severe," as evidenced by plaintiff's injuries, the consequences of which "endured for a significant

2  period of time." *Id.* at 853–54.

3         To deny qualified immunity, the degree of force used here must be the same as or

4  higher than the degree of force used in *Blankenhorn*, *Santos* or some other controlling authority,

5  and the degree of justification for force must be the same or weaker. *See Saetrum v. Vogt*,

6  673 F. App'x 688, 690–91 (9th Cir. 2016) (officer entitled to qualified immunity where two other

7  cases involving officers tackling suspects both "involved greater force and weaker justification

8  than are present here" (citing *Blankenhorn*, 485 F.3d at 478–79; *Santos*, 287 F.3d at 853–54)).

9         As explained below, viewing the evidence in the light most favorable to the

10  plaintiff, as the court must do at this stage, the force Boehm used was as or more significant than

11  the force used in *Blankenhorn* and *Santos*, and the justification for that force was equal to or

12  weaker than the justification in *Blankenhorn* and *Santos*.

13             2.    Degree of Force

14         First, drawing all reasonable inferences in plaintiff's favor, the push delivered by

15  Boehm was as forceful or more forceful than *Blankenhorn*'s gang-tackle or *Santos*' take-down.

16  The court arrives at this conclusion having considered the video of the push itself, the resulting

17  fall, and the evidence of the injuries Gomez suffered.  According to plaintiff and supported by the

18  dashboard camera footage, Boehm's force caused plaintiff to "fly into the air" and land on

19  asphalt, with no opportunity to break his fall.  Opp'n at 12 (citing Dash. Cam. at 22:57:40–41;

20  Colias Decl.).  The push caused severe, possibly permanent, injuries, including dizziness, brain

21  injuries and permanent hearing loss, which appear equally or more serious and lasting than the

22  injuries in *Santos*, requiring plaintiff in that case to wear a back brace and use a walker for

23  approximately a year.  *Santos*, 287 F.3d at 848–49.

24             3.    Strength of Justification for Force

25         Second, the justification for force here was weaker than in *Blankenhorn*.  There,

26  plaintiff was standing near officers, and acting hostilely by pulling his arm away from an officer

27  when he tried to grab it.  Gomez, by contrast, posed less of a threat to officers' safety; he

28  exhibited hostility only verbally towards Officer Moore, and was walking away from the situation

1    at a normal walking pace when Officer Boehm arrived and told him to get down.  Drawing

2    reasonable inferences in plaintiff's favor, there was no reason to believe Gomez posed a threat to

3    officers because he may have been walking to retrieve a weapon from his home, as defendants

4    argue. Mot. at 31.  Even if that was his aim, at his pace, it would have taken Gomez some time to

5    accomplish such a goal, affording officers time to assess the danger of the situation.  Furthermore,

6    assuming that Junior was subdued at the moment Boehm arrived on the scene, as plaintiff

7    suggests, it appears the situation was also not "tense, uncertain, or rapidly evolving," and

8    therefore "the latitude *Graham* requires for split-second police judgments" is not implicated here.

9    *Blankenhorn*, 485 F.3d at 478–79 (citing *Graham,* 490 U.S. at 397).

10          Similarly, the justification for force was weaker here than in *Santos*, because,

11    unlike in Santos's version of the events in that case, Gomez never fled from officers or indicated

12    an intention to actively resist arrest in some manner.  *See Santos*, 287 F.3d at 848 (plaintiff

13    initially fled on foot when officers approached, then became passive when he reached dead end).

14          In sum, viewing the evidence in the light most favorable to the plaintiff, as the

15    court must do at this stage, the force Boehm used was as significant, or more significant, than the

16    force used in *Blankenhorn* and *Santos* and the justification was the same or weaker.  A reasonable

17    officer would have known a strong push or similar tackle was unreasonable where, as here, the

18    suspect (1) did not pose a serious threat to anyone's safety, (2) was not actively resisting arrest,

19    and (3) the severity of the alleged crime was minimal.  Thus, the contours of the law were

20    adequately defined, such that a reasonable officer in Boehm's position would have known he was

21    violating plaintiff's Fourth Amendment rights.  *Wesby*, 138 S. Ct. at 590.

22          D.     State Law Claims

23          Defendants also argue the court should grant summary judgment in their favor on

24    plaintiff's claims for battery, negligence and violation of the Bane Act.  They also argue

25    defendants are entitled to immunity from the state law claims under California Government Code

26    sections 815.2 and 820.2.  The court addresses these arguments below.

27    /////

28    /////

1                 1.     <u>Battery</u>

2               Defendants argue Boehm's use of force was objectively reasonable, and therefore

3 the battery claim against him is meritless.  Reply at 14.  Because the court finds factual disputes

4 preclude a finding that Boehm's actions were objectively reasonable as discussed above,

5 defendants do not meet their burden of showing plaintiff's battery claim fails as a matter of law.

6 Accordingly, defendants' motion for summary judgment on plaintiff's battery claim is DENIED.

7                 2.     <u>Negligence</u>

8               "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff

9 must show that [the] defendant had a duty to use due care, that he breached that duty, and that the

10 breach was the proximate or legal cause of the resulting injury."  *Hayes v. County of San Diego*,

11 57 Cal. 4th 622, 629 (2013).  As plaintiff points out, the California Supreme Court has held that

12 peace officers "have a duty to act reasonably when using deadly force," *id.* at 688 (citations

13 omitted), and defendants do not argue this duty does not extend to the situation here.  Rather,

14 defendants' argument with respect to negligence similarly relies on the assumption that Boehm's

15 actions were objectively reasonable.  For the same reasons stated above, defendants' motion for

16 summary judgment on plaintiff's negligence claim is DENIED.

17                3.     <u>Bane Act (Cal. Civ. Code § 52.1)</u>

18               Plaintiff brings a claim under California's Bane Act, codified at California Civil

19 Code section 52.1, which "protects individuals from conduct aimed at interfering with rights that

20 are secured by federal or state law, where the interference is carried out 'by threats, intimidation

21 or coercion.'"  *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (quoting

22 *Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230 (2007)).  "Section 52.1 provides a

23 cause of action for violations of a plaintiff's state or federal civil rights committed by threats,

24 intimidation, or coercion."  *Id.* (citation and internal quotations omitted).

25               Although there has been some lack of clarity regarding whether the Bane Act

26 requires more than a finding of a constitutional violation, the Ninth Circuit recently adopted the

27 position that the Bane Act also requires "a specific intent to violate the arrestee's right to freedom

28 from unreasonable seizure," *Reese*, 888 F.3d at 1043 (internal quotations omitted) (quoting

1    *Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 801 (2017)).  However,

2    "[e]vidence simply showing that an officer's conduct amounts to a constitutional violation under

3    an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement

4    under the Bane Act."  *Losee v. City of Chico*, 738 F. App'x 398, 401 (9th Cir. June 18, 2018)

5    (citing Reese, 888 F.3d at 1045).  "Rather, [the plaintiff] must show that [the officer] 'intended

6    not only the force, but its unreasonableness, its character as more than necessary under the

7    circumstances.'"  *Id.* (quoting *Reese*, 888 F.3d at 1045).

8           Defendants argue plaintiff's Bane Act claim fails because "there is no evidence

9    that the plaintiff's rights were violated."  Reply at 14.  Because the court finds factual disputes

10   prevent finding as a matter of law that defendants did not violate plaintiff's Fourth Amendment

11   rights, defendants' motion is DENIED as to plaintiffs' Bane Act claims.

12           4.    Immunity under Cal. Gov't Code sections 815.2 and 820.2

13          Defendants also argue they are "immune from liability for Officer Boehm's

14   assessment that Gomez posed a safety risk and for Boehm's tactical decision," Reply at 15,

15   because "Gov. Code §§815.2 and 820.2 immunize these discretionary decisions 'whether or not

16   such discretion be abused,'" MSJ at 22 (quoting *Ortega v. Sacramento Cnty. Dept. of Health and*

17   *Human Servs.,* 161 Cal. App. 4th 713, 728, 733 (2008)).

18          California Government Code section 820.2, part of the California Tort Claims Act,

19   provides: "Except as otherwise provided by statute, a public employee is not liable for an injury

20   resulting from his act or omission where the act or omission was the result of the exercise of the

21   discretion vested in him, whether or not such discretion be abused."  Cal. Gov't Code § 820.2.

22   Section 820.2 "applies to police officers' discretionary decisions made during arrests."

23   *Blankenhorn*, 485 F.3d at 487 (citation omitted).  However, "it has long been established that this

24   provision does not apply to officers who use unreasonable force in making an arrest."  *Id.*

25   (citations omitted); *see also Scruggs v. Haynes,* 252 Cal. App. 2d 264 (1967) ("[A] peace officer

26   making an arrest is liable to the person arrested for using unreasonable force."); *Robinson v.*

27   *Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc) ("California denies immunity to

28   police officers who use excessive force in arresting a suspect.")).  Because Gomez's state law

1    claims arise out of Boehm's use of force during his arrest, and because Boehm is not entitled to

2    summary judgment on Gomez's excessive force claim under § 1983, Boehm is not entitled to

3    summary judgment the state law claims based on section 820.2 liability. *Id.*

4              California Government Code section 815.2 section provides:

5              A public entity is liable for injury proximately caused by an act or
              omission of an employee of the public entity within the scope of his
6              employment if the act or omission would, apart from this section,
              have given rise to a cause of action against that employee or his
7              personal representative.

8              Except as otherwise provided by statute, a public entity is not liable
              for an injury resulting from an act or omission of an employee of the
9              public entity where the employee is immune from liability.

10   Cal. Gov't Code § 815.2. "This provision clearly allows for vicarious liability of a public entity

11   when one of its police officers uses excessive force in making an arrest." *Blankenhorn*, 485 F.3d

12   at 487 (citing *Mary M. v. City of Los Angeles,* 54 Cal.3d 202, 215 (1991) ("[A] governmental

13   entity can be held vicariously liable when a police officer acting in the course and scope of

14   employment uses excessive force or engages in assaultive conduct.")).  Because defendant City of

15   Vacaville does not argue Boehm was acting outside the scope of his employment, and he is not

16   entitled to summary judgment on the use of excessive force, the City is also not entitled to

17   immunity from liability under Government Code section 815.2.

18   V.      CONCLUSION

19            Defendants' motion for summary judgment is DENIED in full, and its evidentiary

20   objections are OVERRULED for the purpose of deciding this motion.

21            A final pretrial conference is set for **Friday, November 6, 2020 at 10:00 a.m.**

22   The parties SHALL meet and confer and file a joint status report 14 days prior to the final pretrial

23   conference addressing matters the court should consider in setting a trial date, including whether

24   they request referral to a magistrate judge to conduct a court-convened settlement before the final

25   pretrial conference. *See* E.D. L.R. 282.

26            This order resolves ECF No. 25.

27            IT IS SO ORDERED.

28   DATED:  August 31, 2020.

                                                    _____
                                                    CHIEF UNITED STATES DISTRICT JUDGE